UNITED STATED FEDERAL DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
========================================

| | |
|---|---|
| JEFFREY SRYMANSKE, | **COMPLAINT** |
| *Plaintiff*, | |
| against | Docket No.: 5:25-cv-00406 (ECC/MJK) |
| OPERATIONS MANAGEMENT INTERNATIONAL, INC. (D/B/A JACOBS ENGINEERING GROUP, INC.), | **JURY TRIAL DEMANDED** |
| *Defendant*. | |

========================================

Plaintiff, Jeffrey Srymanske ("Plaintiff"), by his attorneys Gattuso & Ciotoli, PLLC, for his Complaint against Defendant Operations Management International, Inc., d/b/a Jacobs Engineering Group, Inc., states as follows:

## NATURE OF THE ACTION

1. Plaintiff brings this action under the New York State Human Rights Law ("NYSHRL"), NY Exec. Law § 296 et. seq., seeking redress for Defendant violating its legal obligations and engaging in unlawful disability discrimination.

## THE PARTIES

2. Plaintiff is an individual who currently resides in Cayuga County, New York, and was employed by Defendant from October 2011 until January 17, 2025.

3. Defendant Operations Management International, Inc., d/b/a Jacobs Engineering Group, Inc., is a Foreign Business Corporation authorized to do business in the State of New York.

4. Defendant's principal place of business is located at 555 South Flower Street, Suite 3200, Los Angeles, CA 90071

1

5. Defendant is incorporated in California and, upon information and belief, is a citizen of California for the purposes of federal diversity jurisdiction. 28 U.S.C. § 1332(c)(1).

## JURISDICTION AND VENUE

6. This Court has subject matter jurisdiction pursuant to 29 U.S.C. § 1332 because there is complete diversity of citizenship between the parties, and the amount in controversy likely exceeds the sum or value of $75,000, exclusive of interest and costs.

7. Plaintiff and Defendant are citizens of different states.

8. Plaintiff is a resident and citizen of New York State, where he is domiciled.

9. The federal diversity jurisdiction statute provides that "a corporation shall be deemed to be a citizen of any State by which it has been incorporated and of the State where it has its principal place of business." 28 U.S.C. §1332(c)(1).

10. Defendant is incorporated in California.

11. Defendant's principal place of business is located at 555 South Flower Street, Suite 3200, Los Angeles, CA 90071

12. Because Defendant is incorporated in California and has its principal place of business in California, it is deemed to be a citizen of California for the purposes of federal diversity jurisdiction. 28 U.S.C. § 1332(c)(1).

13. Plaintiff seeks compensatory damages, including back pay wages, benefits, employer provided 401k contributions, front pay, compensation for emotional and mental distress, and attorneys' fees, plus applicable punitive damages. Given the damages sought in the Complaint, the amount in controversy likely exceeds $75,000.

14. There is no administrative exhaustion requirement for Plaintiff's NYSHRL claims against Defendant. NY Exec. Law § 297(9).

15. Venue for this action in the Northern District of New York under 28 U.S.C. § 1391(b) is appropriate because a substantial part of the events or omissions giving rise to the claims occurred in the Northern District of New York.

## FACTUAL ALLEGATIONS

16. Plaintiff was hired by Defendant in October 2011.

17. During the relevant period of time, Plaintiff worked for Defendant as a full-time Operations Supervisor / Lead Operator at its facility in Syracuse, NY, located at 1563 Willis Ave, Syracuse, NY 13204.

18. According to Plaintiff, there is no on-site Human Resources office or representative at Defendant's facility in Syracuse, NY.

19. Plaintiff was last paid an hourly wage of $33.00 per hour.

20. In September 2024, Plaintiff was diagnosed with cataracts in his eyes.

21. Plaintiff's medical condition did not impair his ability to successfully perform the essential functions of his job.

22. Around October/November 2024, Plaintiff had his 2024 performance review completed, during which he was advised that he once again met and/or exceeded expectations. Plaintiff was not informed of there being any problems or deficiencies with his work performance at this time.

23. On December 13, 2024, Plaintiff received a call from his Project Manager, Micheal Fay. During this call, Mr. Fay stated to Plaintiff, "we're concerned about your eyesight," and informed Plaintiff that Defendant was placing him on paid administrative leave. Mr. Fay advised Plaintiff to apply for Short Term Disability, and to submit a request for a workplace accommodation.

24. Plaintiff never requested or wanted to be placed on administrative leave by Defendant.

25. Mr. Fay never cited or identified any alleged problems with Plaintiff's work performance that were related to his eyesight.

26. Mr. Fay never asked Plaintiff if he needed, or believed that he needed, a work accommodation.

27. Defendant never asked Plaintiff to provide any medical documentation, doctor's notes, or other records in connection with his condition prior to placing him on administrative leave.

28. Prior to placing Plaintiff on administrative leave, Defendant never requested or ordered Plaintiff to submit to any kind of testing and evaluation procedures for Defendant to determine if he was capable of performing the essential functions of his job in his current state.

29. Upon information and belief, Defendant did not have any credible evidence that Plaintiff could not successfully perform the essential functions of his job at the time he was placed on administrative leave.

30. Before the call on December 13th ended, Plaintiff advised Mr. Fay that he was scheduled to have bilateral cataract surgeries on January 6, 2025, and January 30, 2025.

31. Approximately one week later, Plaintiff received a call from Chris Goodrich, the Manager of Projects, who also reaffirmed to Plaintiff that he was being placed on paid administrative leave.

32. Plaintiff was told by his doctors that they would not approve him for Short Term Disability for cataracts, which Plaintiff communicated to Mr. Goodrich and Mr. Fay.

33. Plaintiff also advised Mr. Goodrich and Mr. Fay that he could still work from home

if permitted by Defendant.

34. On December 18, 2024, Plaintiff received an e-mail from Mr. Goodrich. The first part of the e-mail restated to Plaintiff that, at that time, his "current options are to pursue ADA accommodations or Short Term Disability until you are able to return to work."

35. Plaintiff did not need a workplace accommodation at the time to perform his job, and would not be approved for Short Term Disability by his doctors for cataracts.

36. Next, Mr. Goodrich's e-mail informed Plaintiff that, after talking to HR and Mr. Fay, Plaintiff would be allowed to take and respond to work calls from home, and that he would just need to log any such calls he handled and charge the time to the appropriate number.

37. Finally, Mr. Goodrich advised Plaintiff:

> In addition, it has come to my attention the you have emailed, texted, and called in recently and taken a lot of time off and charged the project which is being unaware as your supervisor I have approved. This will need to be addressed, and cost transfers conducted transferring these costs from the project to your PTO.

38. According to Plaintiff, the last time he would have taken time off in this manner would have been in October or November 2024, around 1-2 months before he was placed on leave.

39. During that time, Plaintiff was dealing with medical issues unrelated to his cataracts. If Plaintiff could not make it into work on a given day for a legitimate medical reason, he would message his co-operator, Dan DeBarth, to notify him that he could not come in, and would mark down on his timesheet that he was using his accrued PTO for such days.

40. Mr. Goodrich's e-mail inferred that the procedure Plaintiff used to taking his PTO during these times was incorrect, but that this issue could and would be resolved by transferring such costs for time off from the project to Plaintiff's personal PTO, thus mitigating, if not fully negating, any harm to Defendant.

41. Nothing in Mr. Goodrich's message stated or inferred that this issue would result in any adverse action employment against Plaintiff.

42. On December 19, 2024, Plaintiff received an e-mail from Mr. Goodrich stating that he received his annual merit increase of 3% effective December 14, 2024.

43. On January 3, 2025, Plaintiff contacted Mr. Fay to remind him that he was having his first cataract surgery on Monday, January 6, 2025, and that he would be ready to return to work immediately thereafter.

44. In response, Mr. Fay advised Plaintiff via text message that, "I believe you will have to go for fit for duty physical before you return to work, so it likely won't be Tuesday. Chris [Goodrich] and HR will advise on process when they have that info."

45. Plaintiff had been through Defendant's "fit for duty" testing procedure before back in approximately 2015.

46. According to Plaintiff, the standard protocol for a "fit for duty" test is that Defendant was responsible for contacting the employee at issue to schedule the test, as well as make the necessary arrangements for the test to be conducted in a timely manner. The employee did not need to do or provide anything to Defendant beforehand.

47. On January 6, 2025, Plaintiff had bilateral cataract surgery successfully performed on his right eye.

48. After his last message exchange with Mr. Fay and having his surgery, Plaintiff did not hear anything from Defendant until January 17, 2025.

49. Defendant knew that Plaintiff had cataract surgery on January 6, 2025, and was prepared to return to work immediately following that surgery.

50. Through Plaintiff's correspondences with Mr. Fay, Defendant knew that Plaintiff

was requesting to return back to work as of January 7, 2025.

51. Defendant never contacted Plaintiff to schedule a fit for duty test.

52. On January 17, 2025, Plaintiff was asked to join a Teams video conference meeting with Mr. Goodrich and a female representative from Defendant's Human Resources Department.

53. During this meeting, Plaintiff was advised that his employment was being terminated effective immediately. Mr. Goodrich cited two (2) alleged reasons for terminating Plaintiff's employment.

54. First, Mr. Goodrich claimed that Plaintiff "misappropriated time."

55. Mr. Goodrich never specified what exactly he meant when he claimed Plaintiff "misappropriated time," and never provided any examples of such conduct or evidence in support.

56. Upon information and belief, Defendant's allegation that Plaintiff misappropriated time was based on the PTO incident cited by Mr. Goodrich in his e-mail to Plaintiff on December 18, 2024, one (1) month prior to terminating him.

57. Upon information and belief, Plaintiff's PTO issue could and would be resolved by the corrective action described by Mr. Goodrich in his e-mail on December 18, 2024.

58. Second, Mr. Goodrich claimed that Plaintiff had damaged a fence at Defendant's Syracuse facility while plowing snow.

59. This meeting on January 17, 2025, as the first time an allegation that Plaintiff had damaged a fence was ever raised and brought to his attention by anyone from Defendant.

60. According to Plaintiff, the last time he would have plowed snow at Defendant's Syracuse facility was in late November or early December 2024, over one (1) to two (2) months prior to his termination.

61. Mr. Goodrich claimed there was video evidence supporting this allegation, but

never showed it to Plaintiff.

62. Mr. Goodrich never disclosed what the alleged extent of any such damage to this fence was that he claimed Plaintiff was responsible for.

63. According to Plaintiff, other employees of Defendant had damaged the alleged fence and vehicles on it before while snow plowing or while engaging in other work-related activities. However, no one had ever faced any disciplinary action, including termination, because of such incidents.

64. Upon information and belief, knowing that Plaintiff was requesting to return to work at this time, Defendant decided it wanted to find grounds to terminate his employment so it would not need to bring him back.

65. Upon information and belief, the reasons cited by Defendant in support of Plaintiff's termination were pretextual. Defendant relied on alleged incidents that it had been aware of for one or more months while Plaintiff was out on administrative leave, and that were easily rectifiable. Defendant then relied on these reasons as grounds for termination when Plaintiff had expressed his desire to return to work less than two (2) weeks prior.

66. Upon information and belief, Defendant terminated Plaintiff because of his perceived disability and its subjective beliefs concerning his physical limitations due to his medical condition, and thus did not want to bring him back to work.

67. Based on the foregoing, Defendant failed to uphold its legal obligations to Plaintiff as a disabled employee and engaged in intentional acts that amounted to disability discrimination.

**FIRST CAUSE OF ACTION**

**DISABILITY DISCRIMINATION UNDER THE
NEW YORK HUMAN RIGHTS LAW**

68. Plaintiff hereby incorporates paragraphs "1" through "67" inclusive, as if fully set

forth herein.

69. The New York State Human Rights Law (NYSHRL) prohibits covered employers from discriminating against employees based upon an individual's past, current, or perceived disability.

70. Failure to provide a reasonable accommodation for an employee's known disability, or terminating an employee who is able to perform his/her essential job functions with or without a reasonable accommodation for a disability is a recognized form of discrimination under the NYSHRL.

71. While Plaintiff had a diagnosed medical condition, he did not need a workplace accommodation in order to perform the essential functions of his job as Operations Supervisor / Lead Operator.

72. Defendant unilaterally made the decision to place Plaintiff on administrative leave due to his disability, but provided no evidence that Plaintiff could not successfully perform his job at the time.

73. Prior to placing Plaintiff on paid administrative leave, Defendant did not identify any problems with Plaintiff's performance in connection with his eyesight, and never requested nor ordered Plaintiff to submit to any kind of testing procedures to determine if he was capable of safely performing the essential functions of his job with or without an accommodation.

74. Plaintiff advised Defendant when he had completed surgery for his cataracts, and that he was requesting to return to work as of January 7, 2025.

75. Defendant never communicated with Plaintiff about scheduling a "fit for duty" test or any other procedures to have him return to work.

76. Plaintiff was terminated by Defendant for pretextual reasons that Defendant had

been aware of for one (1) or more months and that, upon information and belief, were either meritless, or that had been or were capable of being resolved with no harm to Defendant.

77. Because of his disability, and without any evidence Plaintiff could not perform his essential job functions with a workplace accommodation, Defendant terminated Plaintiff's employment.

78. Defendant's actions were intentional, willful, and made in deliberate disregard of and with reckless indifference to the rights and sensibilities of Plaintiff.

79. Plaintiff has suffered damages as a result of Defendant's unlawful actions, including but not limited to loss of earnings; loss of benefits; loss of career opportunities; mental anguish; and emotional distress; and loss of professional reputation.

## SECOND CAUSE OF ACTION

**FAILURE TO ENGAGE IN INTERACTIVE PROCESS WITH EMPLOYEE UNDER THE NEW YORK STATE HUMAN RIGHTS LAW**

80. Plaintiff hereby incorporates paragraphs "1" through "79" inclusive, as if fully set forth herein

81. The New York State Human Rights Law (NYSHRL) requires all private employers to provide reasonable work accommodations to eligible employees with disabilities, provided that such accommodations do not impose an undue hardship on the employer.

82. At all relevant times, Defendant is an employer as defined under the NYSHRL, and Plaintiff was an employee and qualified individual with a disability as defined under the NYSHRL.

83. Under the NYSHRL, an employer is legally obligated to engage in a good faith interactive process with the employee at issue that assesses the viability and needs of the disabled employee, and the reasonableness of the accommodation(s) requested. An employer's failure to engage in this good faith interactive process is itself a violation of law.

84. Defendant did not engage in a good faith individualized interactive process with Plaintiff. Defendant failed to satisfy this obligation because:

   i. Defendant placed Plaintiff on an administrative leave without conducting any testing or consultation with him to determine if he could safely and successfully perform the essential functions of his job with or without an accommodation.

   ii. Defendant failed to arrange for a fit for duty test to evaluate if Plaintiff could return to work after receiving notice from him that he was requesting to return to work as of January 7, 2025.

85. Defendant's actions were intentional, willful, and made in deliberate disregard of and with reckless indifference to the rights and sensibilities of Plaintiff.

86. Defendant's conduct caused Plaintiffs substantial economic damages, including but not limited to loss of earnings, loss of benefits, and loss of career opportunities, along with compensatory damages for emotional distress and mental anguish. Because it acted with malice or with reckless indifference towards Plaintiffs and his rights under the NYSHRL, they are also liable for punitive damages. Finally, Defendant is liable for the court costs, reasonable attorneys' fees, and expenses Plaintiff has incurred in the prosecution of this matter.

## JURY TRIAL

Plaintiff demands a jury trial as to all issues triable by jury.

## PRAYER FOR RELIEF

Plaintiff respectfully requests that this Court grant her the following relief:

A. A declaratory judgment that Defendant intentionally violated its obligations and Plaintiff's rights under the NYSHRL;

B. Recoverable back pay, including wages, benefits, and 401k employer contributions, with interest;

C. Expenses incurred by Plaintiff that would have been covered by Defendant's insurance;

D. All available front pay,

E. All available compensatory and punitive damages;

F. Attorneys' fees and costs associated with this action;

G. Any other relief that the Court deems proper.

Dated: April 1, 2025

                                    **ATTORNEYS FOR THE PLAINTIFF**

By:    *s/ Ryan G. Files*
          Ryan G. Files
          GATTUSO & CIOTOLI, PLLC
          Bar Roll #: 702255
          The White House
          7030 E. Genesee Street
          Fayetteville, New York 13066
          Phone: 315-314-8000
          Fax: 315-446-7521 (fax)
          rfiles@gclawoffice.com